## 𝔖𝔱𝔞𝔲𝔫𝔱𝔬𝔫.

### R. T. LINKOUS AND W. W. SHUMATE

#### v.

### S. P. HARRIS AND FRANK H. MILLER, PARTNERS UNDER THE FIRM NAME OF FRANK MILLER LAND CORPORATION.

September 21, 1922.

1. AUCTIONS AND AUCTIONEERS—*Action for Commissions—Evidence of Subsequent Private Sale of the Subject of the Auction Sale—Case at Bar.*—Lands were sold at auction under a contract between the owners and the auctioneers that the price obtained must be satisfactory to the owners. In an action by the auctioneers for their commissions there was testimony for plaintiffs strongly tending to show that after plaintiffs had fully performed their part of the contract by the auction sale, the defendants had both expressed themselves satisfied with such performance; that defendants did not, in good faith, make any effort to close the auction sales, but abandoned them for the sole reason that they found they could sell the land at a substantially larger price by private sales, which they made shortly after the auction.

   *Held:* That the evidence on the subject of the private sales made subsequently to the auction sale by the owners of the land was admissible.

2. AUCTIONS AND AUCTIONEERS—*Action for Commissions—Confirmation of Sale by Owner—Subsequent Qualification—Case at Bar.*—Lands were sold at auction under a contract between the owners and the auctioneers that the price obtained must be satisfactory to the owners. After the owners were fully informed as to the purchasers at the auction sale and expressed satisfaction with the prices obtained, and confirmed the sales by agreeing to pay plaintiffs their commissions, they could not, nor could either of them, at any time thereafter, as an afterthought, place a condition upon such satisfaction and confirmation by adding that the commissions would be paid if the purchasers "came across." Under the contract, an unqualified ex-

pression of satisfaction with and confirmation of the sales could not be subsequently qualified. And in the instant case the evidence justified the jury in finding that the defendants had been fully informed who the purchasers were at the auction sale.

3.  AUCTIONS AND AUCTIONEERS—*Action for Commissions—Evidence to Support Instruction that Auctioneers Might Recover if Purchasers' Failure to Complete Sales was Due to Acts of Defendants—Case at Bar.*—Lands were sold at auction under a contract between the owners and the auctioneers that the price obtained must be satisfactory to the owners. In an action by the auctioneers for commissions the court modified an instruction for defendants to the effect that plaintiffs could not recover unless the purchasers complied with the terms of the sale by adding that the failure of the purchasers to comply with the terms of the sale must not have been occasioned by acts of the defendants. There was evidence that one of the defendants declared that he would not confirm any of the sales if a better price could be obtained; that by his own admissions the other defendant made no effort to close the auction sales, and that by a subsequent private sale the defendants obtained an increased price for the land. One of the defendants failed to testify in the case.

    *Held:* That there was evidence to support the instruction as modified.

4.  INSTRUCTIONS—*Repetition.*—The refusal to give an instruction where its subject was covered by another instruction given in the case is not error.

5.  AUCTIONS AND AUCTIONEERS—*Action for Commissions—Peremptory Instruction.*—In an action by auctioneers for commissions, under a contract which provided that the prices obtained at the auction sales should be satisfactory to the landowners or the auctioneers would not be entitled to commissions, but only to the expenses of the sale, the court did not err in refusing an instruction that the jury could not "allow the commissions sued for, but only the expenses mentioned in the contract between the plaintiff and defendant," as the instruction, if given, would have taken from the jury the question of fact as to whether the failure of the purchasers at the auction sale to comply with the terms of sale was or was not occasioned by acts of the defendants.

Error to a judgment of the Circuit Court of Giles county, in an action of assumpsit. Judgment for plaintiff. Defendant assigns error.

*Affirmed.*

This is an action at law instituted by the defendants in error as plaintiffs in the court below against the

plaintiffs in error as defendants in such court. The parties will be hereinafter referred to in accordance with their positions in the trial court or by name. ·

The object of the action is to recover $2,543.33, being 10% commissions on $25,433.30, the aggregate price at which certain land belonging to the defendants was sold at a public auction sale by the plaintiffs, under a contract in writing, the material provisions of which are as follows:

"This Contract of Agreement made and entered into this tenth day of November, 1919, by and between Linkous and Shumate, party of the first part, and Frank Miller Land Corporation, * * party of the second part:

"Witnesseth:

\* \* \* \* \* \* \* \* \* \*

"First: That the said party of the first part has this day engaged the said party of the second part to sell for him at public auction, upon a date to be agreed upon, within sixty days from this date, all that certain tract or parcel of land," (describing it), "containing four hundred and fifty acres, etc.

\* \* \* \* \* \* ·\* \* \* \*

"Fourth: It is agreed and understood that if the said land does not sell for a price that is satisfactory to the party of the first part, that they are to pay to the party of the second part all actual and legitimate expenses incurred in putting on the sale, which amount shall not exceed three hundred and fifty dollars, this amount to include surveys and to be in full for services rendered, but if the sale of the land is confirmed at the price it brought then the party of the first part is to pay to the party of the second part ten per cent of the amount the farm is sold for.   * * * "

(Then follow provisions designating what shall be the cash payment and other terms of sale.)

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*

"Witness the following signatures, in duplicate, on this day and year first above written.

(Signed) "Linkous and Shumate
"By W. W. Shumate
"Frank Miller Land Corporation
"By T. G. McChesney."

There was a trial by jury resulting in a verdict in favor of the plaintiffs as follows: "We the jury find in favor of the plaintiffs and allow the ten per cent commission on the amount of the sale $2,543.33."

Thereupon the defendants moved the court to set aside the verdict, on the grounds that, (a) the court erred in the admission of certain testimony introduced by the plaintiffs, over the objection of the defendants, and in refusing to strike out such testimony on motion of the defendants; (b) in refusing certain instructions offered by the defendants; (c) in amending and giving as amended a certain instruction offered by the defendants; and (d) in refusing to set aside the verdict as contrary to the law and the evidence, and as without evidence to support it. This motion the court overruled and the court entered judgment in accordance with the verdict, and the defendants assign error.

The facts shown in evidence, as they must be taken to be in view of the verdict of the jury, and certain conflicting testimony, are, so far as material, as follows:

Linkous and Shumate, mentioned as the "party" of the first part in the written contract aforesaid, was a mercantile partnership, composed of the defendants, R. T. Linkous and W. W. Shumate, as partners. The title to the aforesaid land was in Linkous, but Shumate was entitled to a share in whatever profits might arise from a sale of it, and the authority of Shumate to execute said contract as he did is not questioned by Linkous.

All of the communications and dealings of the defendants with the plaintiffs, from their inception until after the sale had been made, were, on the part of the defendants, transacted by Shumate entirely. The preliminary talk leading up to the contract, the examination of the land by plaintiffs preceding the execution of the contract, were had with Shumate acting for his partnership, and he thus executed the contract as appears therefrom.

Further: The sale was held on December 9, 1919 (the day agreed upon as provided for in the contract), by the plaintiffs, Shumate being present on the ground acting in behalf of his firm. Linkous was not present at the sale.

At the sale the land was offered for sale in parcels by the plaintiffs' auctioneer. Prior to the sale, upon the request of the plaintiffs to know what aggregate price would be satisfactory to defendants, and what total sale price would be confirmed, Shumate stated to plaintiffs that $25,000.00 would be satisfactory as the total price, and that the sale would be confirmed if they aggregated that amount. Thereupon the sale proceeded and the bids aggregated $25,433.30 as aforesaid. As the land was bid off one of the agents of plaintiffs, acting as clerk, had the purchasers and the auctioneer both sign memoranda in writing setting forth the description of the respective parcels bought, the price and terms of sale—the latter being, in each instance, in accordance with the provisions of the aforesaid contract on the subject of the terms of the sale. Just before the last parcel of the land was offered for sale, and it had become evident that the whole of the land would sell for an aggregate of $25,000.00, which Shumate had stated as aforesaid, in advance of the sale, would be a satisfactory price, and would be a price at which the

sale would be confirmed, the following occurred, according to the testimony of the plaintiff Miller, who was present supervising the conduct of the sale: "Mr. Shumate asked us to wait a little while, and he walked over this tract of land" (the last parcel to be offered), "with a man from West Virginia, as well as I remember his name was Leedy, but I am not positive about that. He came there to buy some land and he waited some little bit and finally Mr. Shumate got up on the hill where we could see him and we called him back down there, and when he come back, just before he came up to the wagon," (the auction wagon), "I met him and told him the crowd was getting restless and we wanted to go ahead with the sale, and he said,' Well,' he said, 'before we go any further with this sale I will go into a written contract with you, to pay you $2,500.00 commission, but,' he said, 'I am not going to let these three tracts that we sold down there this morning,' the three first tracts we sold, 'nor this tract go; because,' he said, 'if this man I had up there with me can get his partner over from West Virginia, I believe he will give me $25,000.00 for those four tracts, and I am not going to let them go or this one;' and I said, 'it is not necessary to go into a written contract, the written contract we have got is all that is necessary, provided you have the auctioneer confirm the sale, etc.;' so he said he would do that, and that I told him in order to make the farm bring $25,000.00 it wasn't necessary for him to bid but $70.00 an acre on the remaining tract, which he said he wanted to do, and he did bid that on that tract, as well as I remember, and bought it at $80.00 per acre, and after that he told me he was ready to confirm the sale and have the auctioneer announce that the sale was confirmed, and that they would meet at the Narrows that evening, and then he changed

that, and said to meet at the Narrows the next morning to make the deeds."

"Q. Then Mr. Shumate, after the sale was made of all the different tracts, directed the auctioneer in your presence to announce that the sales were confirmed and for the parties to come forward and comply with the terms of sale?

"A. Yes, sir.

"Q. And the auctioneer did this?

"A. Yes, sir.

"Q. In the presence of Mr. Shumate?

"A. Yes, sir; that is the way we always have our auctioneers do at the close of the sale."

The testimony for the plaintiffs was to the effect that at this auction sale Shumate was in truth the bidder for all of the land except four parcels, aggregating something over $10,000.00, which was bid in by one M. D. Robertson, who is a father-in-law of Shumate; but that Shumate had one Lambert sign the said memoranda for three of the parcels and one Dungan sign the memoranda for the other parcel in truth bid in by Shumate, Robertson signing for the parcels bid in by him.

These memoranda had all been signed by the auctioneer and said parties as purchasers, and Shumate knew how the memoranda had been signed, before he confirmed the sale as aforesaid.

Thereupon every one left the place of sale and the plaintiff Miller, the defendant Shumate, and others, went to the store of Linkous and Shumate. On their way to the store Miller met Linkous, coming out to the sale, and Linkous returned to the store. Either before or after getting to the store, Miller, according to this testimony, told Linkous the result of the sale, the total amount of the sale aforesaid, and who all of

the bidders were. On this subject Miller testified as follows: "I told him (Linkous) that Mr. Robertson, Mr. Shumate's father-in-law, had bought four tracts of land and I told him that Mr. Shumate had bid in one tract of land for himself, and I told him that a man by the name of Lambert had signed for two tracts which I had every reason to believe that Mr. Shumate had him buy for him. I said Mr. Lambert refused to sign for those tracts when the clerk went to him, and then, after the last tract was sold, Mr. Shumate had Mr. Lambert sign for that tract and then he" (Lambert) "said, 'I will sign for the other two tracts.' Then I also told him that the home tract was bought by Mr. Shumate, although it was signed for by a man named Dungan. My reason for that was because I had gone to Mr. Dungan and asked him to give me a bid on the land and he told me he was not interested in it and when his bid was turned in Mr. Shumate was standing by him talking to him." Miller was then asked and, so far as material, answered as follows:

"Q. What did Mr. Linkous state in regard to that?

"A. It doesn't make any difference who bought it, if Mr. Shumate bought it he will have to take it like anybody else and pay for it."

The testimony for the plaintiffs was to the effect that the plaintiff, Miller, then told Linkous that the plaintiffs would not be at Narrows the next day, that they had to go to another sale, but wanted to know something about their commissions; and that Linkous thereupon said: "Well, you can rest assured, you will get your commission." Linkous, in his testimony on this subject, said: "After we went back to the store, I had not met any of these gentlemen that were selling the land, but was introduced to them there  *    *    *

and they asked me if I was satisfied with the sale,
\* \* \* and I told them I was, I thought it brought
a very fair price.'' Linkous thereupon further testified
that when he made this statement he had been in-
formed of the total amount of the sale and who some
of the purchasers were, but none of the papers had
been turned over to him and that he ''did not know
who they all were;'' and that on his being shortly
afterwards called into the back room where the plain-
tiffs wanted ''to settle up,'' he ''told them that they
would get every dollar of their commissions if the
people came across''—meaning if the purchasers came
forward the next day at Narrows and closed their
purchases in accordance with the aforesaid memoranda
signed by them.

The next day Shumate did not appear, and none of
the purchasers appeared to close the sales, except
Robertson, who appeared and stated to Linkous that
he was not able to pay for all four of the parcels of
land bid in by him and that he did not want but two
of them, and refused to take the four parcels. Linkous
states in his testimony that he did not insist on Robert-
son's complying with his contract of purchase evidenced
by the memoranda Robertson had signed, because
Robertson told him ''he was misled and did not know
he was getting the two upper tracts and he couldn't
pay for them and he wouldn't take them,'' and because
he ''knew Mr. Robertson long enough to know that he
was positive,'' and that the transaction ''just stopped
there;'' that he (Linkous) then ''dropped it'' and that
he did not insist on Dungan's complying with his con-
tract. He says nothing specifically about what he did
about requiring Lambert to comply with the memo-
randa signed by Lambert for three of the parcels of
the land (which memoranda were introduced in evi-

dence), nor about requiring Shumate to comply there-with. Lambert testified, however, to the effect, in substance, that he acted merely at the request of Shumate and that Shumate was the real purchaser of the land for which Lambert signed the memoranda aforesaid. Neither Shumate nor Dungan testified in the case, and there was no testimony controverting the above mentioned testimony of the plaintiff, Miller, to the effect that all of the sales, except that to Robertson, were in truth to the defendant, Shumate, and that Linkous knew this, and knew that Robertson was the purchaser of the residue of the land before Linkous expressed his satisfaction with the sales and consented to pay the commissions.

Linkous and M. D. Robertson testified to the effect that on December 13th, four days after the auction sale, the defendants executed a deed conveying to M. L. Robertson, a son of the above mentioned M. D. Robertson, three of the parcels of land, which the latter bid in at the auction sale, at the price of $8,000.00.

On his cross-examination Linkous testified that "a very short time after that" the defendants sold to one T. E. Turner two other parcels of the land for $9,000.00 and to "a man by the name of Stowers" the residue of the land for $10,000.00, making the total price thus obtained for the land $27,000,00, an excess of $1,566.70 over the auction sale price.

The testimony mentioned in the two next preceding paragraphs is the testimony which is referred to in the motion to set aside the verdict of the jury on the ground of the erroneous admission and refusal to exclude testimony, which is above mentioned.

The plaintiffs asked for no instructions.

The defendants asked for the following instructions:

"Instruction No. 1. The court instructs the jury that

in order for the plaintiff to recover the commissions sued for, it is necessary for them to prove the purchasers of the land complied with the terms of sale, by paying the one-fourth cash, and executing the deferred purchase money notes, as set forth in the contract between the plaintiff and the defendants, or offered to pay said cash payment and execute said deferred purchase money notes.

"Instruction No. 2. The court instructs the jury that if they believe from the evidence that the purchaser, M. D. Robertson, failed to pay the cash payment and execute the deferred purchase money notes, and such failure was not caused by any act of the defendants, then upon such refusal and failure on the part of said Robertson, the defendants had the right to reject the other sales made.

"Instruction No. 3. The court instructs the jury that they cannot allow the commissions sued for, but only the expenses mentioned in the contract between the plaintiff and defendant."

The court refused to give Nos. 2 and 3 of such instructions; but modified instruction 1, by adding at the end of it the following: "unless the failure of the purchasers at the sale to pay the cash payment and execute the deferred purchase money notes was occasioned by some acts of the defendants"—and gave such instruction as so modified. This was the only instruction given.

*R. L. Jordan* and *Jackson & Henson*, for the plaintiffs in error.

*Williams & Williams* and *M. P. Farrier*, for the defendants in error.

SIMS, J., after making the foregoing statement, delivered the following opinion of the court.

The questions presented by the assignments of error will be disposed of in their order as stated below.

[1] 1. Did the court err in admitting, or in refusing to exclude, the testimony above mentioned on the subject of the sales of the land made by the defendants subsequently to the auction sales made by the plaintiffs?

The question must be answered in the negative.

It is true that these sales were not made by the plaintiffs or to the same purchasers as those whom the plaintiffs had obtained at the auction sale, and, hence, the evidence in question was not admissible on that ground. But in view of the testimony for the plaintiffs, strongly tending to show that after the plaintiffs had fully performed on their part their contract with the defendants by the auction sale and the defendants had both expressed themselves satisfied with such performance, after knowing who the purchasers were and what character of contracts plaintiffs had obtained from them at the auction sale, the defendants did not, in good faith, make any effort to close those sales, but decided not to do so and abandoned them all, for the sole reason that the defendants found that they could sell the land at a substantially larger price by making the private sales which they did make shortly after the auction sale, it is manifest that the testimony in question was properly admitted.

[2] It is argued for the defendants that there was no evidence before the jury to show that Linkous knew who all of the purchasers at the auction sale were before he announced his satisfaction with such sale; and that he had the right to subsequently qualify his expression of satisfaction and confirmation of such sale, in agreeing to pay the plaintiffs their commissions, by the statement, which he claims to have later made, to the effect that such commissions would be paid "if the people" (meaning such purchasers) "came across."

But, as set out in the statement preceding this opinion, we find ample evidence in the record, which was before the jury, warranting them in concluding that Linkous had been fully informed who all the purchasers at the auction sale were before he announced his satisfaction with the sale and confirmed the sale by consenting to pay the commissions, and that his testimony on the trial to the contrary was to be taken *cum grano salis.* This being so, even if Linkous, after confirming the sale as aforesaid, subsequently attempted to qualify his confirmation of the sale by adding, in the talk in the back room, that the commissions would be paid "if the people came across," that was too late to disturb the right of the plaintiffs to their commissions, since that right became fixed the moment the defendants in fact became satisfied with the price obtained at the sales by plaintiffs and confirmed such sales.  They could not, nor could either of them, after having become satisfied and having confirmed the sales, at any time thereafter, as an afterthought, place a condition upon such satisfaction and confirmation for which the contract makes no provision.  Under the contract, an unqualified expression of satisfaction with and confirmation of the sales could not be subsequently qualified.

[3] 2.  Did the court err in modifying instruction No. 1 asked for by the defendants by the addition, "unless the failure of the purchasers at the sale to pay the cash payment and execute the deferred purchase money notes was occasioned by some act of the defendants?"

The question must be answered in the negative.

It is urged in argument for the defendants that there was no evidence before the jury sufficient to show that any act of the defendants occasioned the failure of the purchasers at the auction sale to close their purchases

in the particulars mentioned in the *addendum* to the instruction under consideration. That position overlooks the testimony of the plaintiff, Miller, to the effect that Shumate, at the close of the auction sale, declared the purpose not to consummate any of the auction sales if it was found that a better price for the land could be obtained by subsequent sales to other purchasers; also overlooks the fact that the defendant, Shumate, failed to testify in the case; that he failed to comply with his purchases at the auction sale; and likewise overlooks the testimony with respect to the conduct of the defendant, Linkous, which shows, by his own admissions, indeed, that he made no effort whatever to close the auction sale purchases; and, too, overlooks the very pertinent fact that the defendants obtained an increase of price, amounting to $1,566.70, by abandoning the auction sales and making the subsequent private sales which they did make of the land.

[4] 3. Did the court err in refusing to give instruction No. 2?

The question must be answered in the negative.

The subject of the instruction here in question was covered by the *addendum* aforesaid to instruction No. 1 as given.

[5] 4. Did the court err in refusing to give instruction No. 3?

The question must be answered in the negative.

From what has been said it is manifest that this instruction, if given, would have taken from the jury the question of fact submitted to them by the aforesaid *addendum* to the instruction which was given.

An interesting argument, accompanied by citations of authorities, is contained in the brief of the learned counsel for defendants, on the subject of the unconstitutionality of the section of the Virginia Code

(section 6003), forbidding the direction of verdicts, and urging that we should review and reverse our previous holdings on that subject and decide that the instruction No. 3, under consideration in the instant case, should have been given, notwithstanding the fact that it is a peremptory instruction. Inasmuch, however, as we have, for a different reason from that of the unconstitutionality of the statute mentioned, reached the conclusion above expressed with respect to the erroneous character of the instruction, it becomes unnecessary for us to deal with the constitutional question presented.

The case will be affirmed.

*Affirmed.*